IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Action No. 5:08CR00030 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **& ORDER** |
| CLIFTON THOMAS TALLEY | ) | |
| | ) | By: Samuel G. Wilson |
| | ) | United States District Judge |

The United States has charged the Defendant, Clifton Thomas Talley, with two counts of knowingly possessing material containing images of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2). The matter is before the Court on Talley's Motion to Suppress. Talley contends that the police initially detained and ultimately arrested him in violation of the Fourth Amendment and that everything that followed is the fruit of the poisonous tree. Additionally, he contends that the affidavit supporting the search warrant authorizing the search of his residence was based on "knowing or reckless falsity" and is therefore not subject to the good faith exception to the exclusionary rule. Finding that reasonable suspicion justified the stop, probable cause justified the arrest that followed, and that the affidavit supporting the search warrant authorizing the search of his residence was not based knowing or reckless falsity, the court denies Talley's motion.

I.

Based on the testimony of United States Probation Officer Tammy Wellborn, Staunton Police Officer Robert Hildebrand, Staunton Police Officer Ray Murray, and Criminal Investigator Chad Nestor, and the parties' written submissions, the court makes the following factual findings:

On July 5, 2008, at approximately 2:25 p.m.,[1] a woman speaking broken English called the 911 dispatcher from the Staunton Public Library and reported that she had just witnessed a man looking at child pornography on a computer. The woman described what she had seen and left a number where she could be reached. The dispatcher relayed her description to Officers Hildebrand and Murray, describing the suspect as a white male with brown hair, 40-50 years old, wearing shorts and slip-on shoes, located in the computer area "straight back" from the front doors of the library. Hildebrand remembered the dispatcher said the caller spoke broken English.

Both officers arrived at the library by 2:38 p.m. Hildebrand and Murray entered through the main entrance on the northeast side, and initially checked the main part of the library and the computer room located to the left of the front doors. Finding no one matching the description, Hildebrand radioed dispatch to request more information from the female caller.[2] The dispatcher repeated the description, again emphasizing he was located "straight back" from the front doors. The dispatcher had a callback number, and the officers told the dispatcher to arrange a meeting. Searching the right side of the library, the officers noticed Talley seated at a library table using a laptop computer. He was seated on the west side of the library, "straight back" from the front doors, and was the only person the officers found matching the caller's description. Hildebrand made eye contact with Talley when he was ten to twelve feet away; Talley made eye contact three more times with Hildebrand. Judging from his hand movements, Talley appeared to be

---

[1] The times referred to in the court's findings of fact are adopted from the Staunton Police Department Event Report that records the timing of communications between the dispatcher, caller, and the two officers. (Def.'s Ex. 2.)

[2] The dispatcher added that the suspect may be wearing bedroom slippers. There is an audio recording of this communication, but no corresponding entry appears in the Event Report.

2

nervously logging off his laptop. Both officers glanced at Talley's screen to see the application he was closing, but they only saw a program screen or the desktop image.

The officers then went to the library's administrative desk. While Murray was talking to a librarian about the library's wireless internet policy, both officers noticed that Talley, carrying a backpack, was exiting the library. Murray finished talking to the librarian while Hildebrand went outside to contact Talley.

Hildebrand exited the library, and called for Talley when the two men were about eight feet apart. Talley stopped and Hildebrand notified him that he matched the description of a suspect who was reportedly looking at child pornography on a computer inside the library. Hildebrand asked Talley if he actually was looking at child pornography, and Talley denied it. Hildebrand asked for consent to search his laptop; Talley replied that Hildebrand would need a search warrant. Hildebrand then requested identification, and when Talley produced his driver's license, Hildebrand asked him to step over to the patrol car so that Hildebrand could query his driver's license information from the mobile data computer inside the patrol car. Hildebrand removed Talley's backpack from his shoulder and placed it on the hood of the patrol car. While Hildebrand queried Talley's driver's information, Murray rejoined them and stood near Talley.

Hildebrand queried Talley's driver's information at 2:46 p.m. At 2:47 p.m., Hildebrand notified the dispatcher that he was speaking with Talley. The dispatcher reported that the caller, located by the entrance, believed Hildebrand was speaking with the wrong person. Hildebrand acknowledged this. The driver's license query revealed that Talley had child pornography

3

convictions and that he was a registered "sexually violent predator,"[3] and Murary reentered the library to speak with the caller.

Hildebrand then learned that Talley was on probation or some form of supervision for his convictions.[4] Talley, who understood that Hildebrand was investigating Talley for a child pornography offense, asked Hildebrand to give him a break because he was sick. When Hildebrand asked if Talley was mentally or physically sick, Talley stated that he could not stop looking at pornography. Hildebrand arrested Talley, handcuffed him, and placed him in the patrol car. He opened Talley's backpack and found a laptop computer and a notebook. Hildebrand then radioed Murray and told him Talley admitted to the offense.

Meanwhile, Murray located the caller inside the library. She described the image she saw as that of a young Hispanic or Asian female, with straight hair, about ten years old, completely nude with something resembling paper that covered her eyes. As Murray was exiting the library

---

[3]Hildebrand only recalled noticing that Talley had been charged for certain sexual offenses, but Hildebrand and Chad Nestor explained how a driver's license query also searches within the VCIN and NCIC databases. Nestor produced a copy of the VCIN and NCIC replies listing Talley's child pornography convictions and his status as a registered sexual offender (Def.'s Ex. 5), and verified that the information contained in those replies predated Talley's arrest on July 5, 2008.

[4]There is a factual dispute about how much information Hildebrand learned about Talley's supervision at this point. Hildebrand testified on direct examination that Talley informed him that Tammy Wellborn was his probation officer, but on cross examination Hildebrand admitted that it was just as likely that he learned this information from the interrogation conducted at the police department. On redirect, Hildebrand testified that he either learned that Talley was on probation from his computer, or he asked Talley about it. Also, Murray testified that Hildebrand mentioned Talley was on probation when Murray returned to the patrol car after initially contacting the caller inside the library.
Additionally, Tammy Wellborn clarified that Talley was on supervised release with the United States Probation Office for the Western District of Virginia for a 2001 conviction for distribution of child pornography.

4

to rejoin Hildebrand, he saw that Hildebrand was taking Talley into custody. Murray also searched Talley's backpack, and looked through Talley's notebook which appeared to contain references to child pornography websites. Before leaving for the police department, Murray reentered the library and the caller provided her contact information and showed Murray where she had witnessed Talley looking at the image.

Before both officers interviewed Talley at the police department, Officer Murray read Talley his Miranda rights and insisted Talley sign a waiver before speaking with them. Talley initially declined the interview, but after further questioning signed the Miranda waiver and spoke with the officers for about two hours. At the end of the interview Talley admitted to having nude images of underage males stored on his computer.

That same day, Officer Murray successfully applied for a search warrant for Talley's laptop. A search of the hard drive uncovered images of child pornography. On July 7, 2008, Investigator Chad Nestor compiled some of these images and successfully sought several arrest warrants and a search warrant for Talley's residence. In the search warrant affidavit, Nestor summarized the events of July 5, 2008 and described the image the caller observed as a "sexually explicit photograph of a young girl clearly under the age of eighteen." Nestor believed that a nude photograph of a minor not in the possession of the minor's legal guardian was a "sexually explicit" photograph.[5] This case was Nestor's first child pornography investigation, and in drafting the affidavit he sought help from another officer and conferred with the other members of his unit who agreed "sexually explicit" was an appropriate description. The magistrate issued

---

[5]Virginia law defines "sexually explicit visual material" as any image depicting "sexual bestiality, a lewd exhibition of nudity, . . . or sexual excitement, sexual conduct or sadomasochistic abuse . . . ." Va. Code Ann. § 18.2-374.1(A).

5

the search warrant, and a search of Talley's residence uncovered a diskette containing images of child pornography.

## II.

For Fourth Amendment purposes, Talley's encounter with the police distills to this: Officers Hildebrand and Murray responded to a report of an individual viewing child pornography on a computer, and they observed Talley, the only person matching the suspect's description, seated in the area the caller described, furtively using a laptop computer. When they saw him exit the library with a backpack, Hildebrand detained him by his patrol car. Hildebrand then learned that Talley had child pornography convictions, was registered as a "sexually violent predator," and was on supervision. When Talley, aware he was a suspect in a child pornography investigation, stated that he was sick and could not stop looking at pornography, Hildebrand arrested him.

From this factual basis, Talley argues that the investigatory stop and the arrest that followed violated his Fourth Amendment rights, and the court is required to suppress all evidence resulting from these illegal intrusions because it is "fruit of the poisonous tree." The court finds instead that reasonable suspicion existed for an investigatory stop because the caller's tip was not in a strict sense anonymous and possessed important indicia of reliability. Moreover, a reasonable officer could consider Talley's behavior furtive when the officers approached him. Reasonable suspicion then elevated to probable cause because, as the court finds, Hildebrand apprised Talley that a person meeting Talley's description at the library was viewing child pornography on a computer and Talley eventually responded by requesting that Officer Hildebrand "give him a break" because he was sick and could not stop looking at pornography.

6

Under the circumstances found by the court, a reasonable officer would have concluded that Talley had admitted to looking at child pornography in the library on the computer. Accordingly, the court denies Talley's Motion to Suppress on the grounds that the investigatory stop and arrest violated the Fourth Amendment.

A.

Talley argues that the officers lacked reasonable suspicion to detain him at the patrol car because Officers Murray and Hildebrand acted on an uncorroborated, totally anonymous tip that generically accused a man meeting Talley's description of looking at child pornography. The court disagrees. Reasonable suspicion existed because the caller witnessed the criminal conduct, was present at the scene, and was willing to meet with the officers.

A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). "'Reasonable suspicion', like any 'reasonableness' standard, defies precise definition. Far from being susceptible to a 'neat set of legal rules,' it is, as the Supreme Court has described, a 'commonsense and nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008) (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996)). Reasonable suspicion depends on the totality of circumstances; a court must look to "the circumstances known to the officer and the 'specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" United States v. Smith, 396 F.3d 579, 583 (4th Cir. 2005) (quoting Terry, 392 U.S.

at 27). Although reasonable suspicion is not susceptible to a "neat set of legal rules," there are two problems with allowing truly anonymous tips to serve as the sole basis for a Terry stop. "First, anonymous tips 'alone seldom demonstrate[] the informant's basis of knowledge or veracity.'" United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (quoting Florida v. J.L., 529 U.S. 266 (2000)). "Second, since anonymous tipsters cannot be held responsible for fabricated allegations, permitting such tips to result in a Terry stop would increase the potential for harassment through false accusation." Id. Therefore, when an informant's tip provides part of the basis for reasonable suspicion, the court must ensure the tip "possesses sufficient indicia of reliability." United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004). The court finds sufficient indicia here.

Before detaining Talley at the patrol car, Officer Hildebrand knew the following: (1) a 911 caller reported that a man was looking at child pornography on a computer at the Staunton public library; (2) the dispatcher had her callback number and was arranging for her to meet with the officers; (3) Talley was the only person matching the caller's description in the library; (4) Talley was using a laptop computer; (5) Talley made repeated eye contact with Officer Hildebrand and was nervously logging off the laptop; (6) Talley exited the library with a backpack; and (7) Talley, by refusing to consent to a search of his laptop, implicitly acknowledged that he was carrying the laptop inside his backpack. Considered in their totality, these circumstances establish reasonable suspicion that criminal activity was afoot, thus warranting further inquiry.

Several facts distinguish the female caller in this case from the truly anonymous tipster, thus erasing the concerns of basing reasonable suspicion on the information she provided. First,

8

the female caller personally witnessed the illegal conduct; therefore, her "basis of knowledge–a contemporaneous viewing of the suspicious activity–enhanced the tip's reliability." Perkins, 363 F.3d at 322. Second, the officers knew the dispatcher had her callback number, and therefore knew the caller could be held accountable for fabricated allegations. See United States v. Andrade, 551 F.3d 103, 110 (1st Cir. 2008) (finding a tip reliable where the dispatcher obtained the caller's telephone and address from the caller ID, and the caller knew his call was recorded, confirmed his location, and caller represented that he had personally observed the reported conduct). Third, the officers knew they would soon be meeting with the caller, further enhancing her reliability and further reducing the "potential for harassment through false accusation." Christmas, 222 F.3d at 144. "When an unidentified tipster provides enough information to allow the police to readily trace her identity, thereby subjecting herself to potential scrutiny and responsibility for the allegations, a reasonable officer may conclude that the tipster is credible." United States v. Reaves, 512 F.3d 123, 127 (4th Cir. 2008). In sum, the caller's personal observation and her willingness to hold herself accountable gave her tip the indicia of reliability necessary for reasonable suspicion to exist.

Officer Hildebrand's personal observations further supported the existence of reasonable suspicion. Talley was the only person in the library matching the caller's description, and Hildebrand found him seated in the area the caller had indicated. This independent confirmation of the suspect's appearance and location "offers important corroboration of the tip." Perkins, 363 F.3d at 322; see also United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003) ("[P]olice observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable

9

suspicion that the individual is the subject of the dispatch."). Additionally, Talley's conduct was furtive when the officers first approached him. Furtive conduct, in connection with an anonymous tip, can provide reasonable suspicion to support an investigative stop. See United States v. Sims, 296 F.3d 284, 287 (4th Cir. 2002) (finding reasonable suspicion existed for a Terry stop and frisk where officers received an anonymous call that a man had recently fired a gun, and when the officers arrived on scene they found a man matching the description crouching behind a house and peeking around the corner who jerked out of view upon making eye contact with the officers). Here the tip was not totally anonymous.

Although Talley argues that reasonable suspicion evaporated when the dispatcher told Hildebrand the caller believed he was speaking with the wrong person, Hildebrand received this information after he already had reasonable suspicion to lawfully detain Talley. For reasonable suspicion to exist, "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers." McCoy, 513 F.3d at 413. Hildebrand was not required to eliminate every innocent person before stopping Talley, "just a substantial portion of them." Id. By investigating the caller's tip, finding the only person matching the description, and observing Talley's furtive behavior with a potential instrumentality of the crime being investigated, Hildebrand had winnowed away a substantial portion of the innocent library patrons. His stop was therefore justified.[6]

---

[6]Moreover, it would have been reasonable for Hildebrand to disregard this information as a miscommunication given that the encounter was fast-paced, the caller spoke limited English, and Hildebrand received this information contemporaneous with the results of Talley's driver's license query.

10

**B.**

Even if reasonable suspicion justified the investigatory stop, Talley nonetheless argues Hildebrand did not have probable cause to arrest him. Again, the court disagrees.

"A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003). Probable cause requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). Probable cause is a "practical, nontechnical conception," Brinegar v. United States, 338 U.S. 160, 176 (1949), that depends on the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230 (1983). "Under this pragmatic, common sense approach, [courts] defer to the expertise and experience of law enforcement officers at the scene." United States v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004). "An informant's truthfulness and reliability, while certainly relevant, are only two factors among many that courts may consider" in determining whether probable cause existed. United States v. White, 549 F.3d 946, 950 (4th Cir. 2008).

When Hildebrand initially engaged Talley, Hildebrand informed him that he matched the description of a suspect looking at child pornography inside the library. After querying Talley's driver's licence information, Hildebrand learned that Talley had prior child pornography convictions, was registered as a sexually violent predator, and was on supervision. Talley then asked Hildebrand to give him a break because he was sick, and in response to Hildebrand's clarifying question, further admitted that he could not stop looking at pornography. Talley's own

11

response was a sufficient link in the chain to establish probable cause for his arrest. Given the circumstances of the investigation, a reasonable officer would have concluded at that moment that Talley had in fact admitted to accessing child pornography in the library on the computer as the witness had just relayed to the authorities. Hildebrand's arrest of Talley was therefore justified, and the court will deny Talley's Motion to Suppress based on the "fruit of the poisonous tree" doctrine.

### III.

Talley contends that the affidavit supporting the search warrant authorizing the search of his residence was based knowing or reckless falsity and that the resulting search, therefore, is not subject to the good faith exception under United States v. Leon, 468 U.S. 897 (1984).[7] The Court finds that the affidavit did not contain knowingly or recklessly false information and finds the search subject to Leon's good faith exception.

"Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if 'the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" United States v. Lalor, 996 F.2d 1578, 1583 (4th Cir. 1993) (quoting United States v. Leon, 468 U.S. 897, 926 (1984)). Although Investigator Nestor's characterization of the image the caller observed (a nude underage female with something

---

[7]The court's conclusion that Hildebrand lawfully detained and lawfully arrested Talley essentially moots Talley's other challenges to the two searches. With the laptop search, Talley has only argued that the search was illegal because the affidavit relied on tainted evidence directly flowing from his illegal arrest. Absent this moot argument, Talley has not suggested why the good faith exception should not apply to the laptop search. The same is true with the search of Talley's residence; aside from making that same argument, Talley has only challenged Investigator Nestor's characterization of the image the caller observed as "sexually explicit."

12

resembling paper covering her eyes) as "sexually explicit" might have been imprecise, nothing suggests that Nestor was deliberately or recklessly false in preparing his affidavit. Accordingly, the court concludes that both searches were subject to Leon's good faith exception.

### III.

For the reasons stated, it is **ORDERED** and **ADJUDGED** that Talley's Motion to Suppress is **DENIED**.

Enter: This 19th day of May, 2009

_____
UNITED STATES DISTRICT JUDGE